UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
:
FREEPLAY MUSIC, INC., :
:
               Plaintiff, :
:
      v. :
: 04 Civ. 5238 (GEL)
COX RADIO, INC., CUMULUS MEDIA, INC., :
ENTERCOM COMMUNICATIONS CORP., : **OPINION AND ORDER**
BEASLEY BROADCAST GROUP, INC., :
CITADEL BROADCASTING CORP., :
and VIACOM INC., :
:
               Defendants. :
:
-----------------------------------------------------------x

Gabriel Fischbarg, Toptani Law Offices,
New York, New York, for Plaintiff.

Michael E. Salzman, Hughes Hubbard & Reed LLP,
New York, New York (Jason C. Benton, of counsel),
for Defendants Cox Radio, Inc., Cumulus Media, Inc.,
Entercom Communications Corp., Citadel Broadcasting
Corp., and Viacom Inc.

GERARD E. LYNCH, District Judge:

      Plaintiff Freeplay Music, Inc. ("Freeplay") holds copyrights in certain musical compositions and sound recordings. In this action for copyright infringement, as explained in the Court's prior opinion denying defendants' motion to dismiss, plaintiff contends that defendants, owners of certain radio stations ("Broadcasters"), violated its "synchronization rights" by producing and broadcasting commercials or other programming that reproduced Freeplay's copyrighted materials on a single recording with other materials. See Freeplay Music, Inc. v. Cox Radio, Inc., No. 04 Civ. 5238 (GEL), 2005 WL 1500898 (S.D.N.Y. June 23,

2005).

In the earlier opinion, the Court declined to dismiss the complaint, holding that although the complaint was less than clear, it appeared that "[a]t a minimum, Freeplay's complaint can be construed as asserting that the Broadcasters did not merely broadcast programming supplied by an outside producer that violated its synchronization rights, but actually produced infringing materials themselves, an accusation that would state a claim for violation of copyright." Id. at *3. The parties have now filed cross-motions for partial summary judgment that pose the question whether Freeplay can prevail on a claim that the Broadcasters violated its copyrights simply by broadcasting allegedly infringing materials created and supplied by others. Since it may not, defendants' motion will be granted, and plaintiff's denied.

**BACKGROUND**

I.  Procedural History

Freeplay filed its complaint on July 2, 2004. As noted in the Court's prior opinion, the complaint itself appeared to allege only that the Broadcasters had infringed Freeplay's copyrights by "broadcasting Freeplay's copyrighted sound recordings and compositions over the radio as part of their regular programming." Id. at *1. In fact, however, it emerged from the briefing of defendants' initial motion to dismiss that Freeplay's claim was a quite different, and more complex, allegation that the Broadcasters had violated its "synchronization rights" by broadcasting or creating recordings that *incorporated* Freeplay's musical compositions into a larger whole, for example, by using Freeplay's compositions as background music during a commercial or promotional spot in which a product or service is advertised. The Court denied the motion, holding that the complaint stated a copyright cause of action, at the very least to the

2

extent that it asserted that the Broadcasters had themselves created such recordings. Id. at *3.

The Broadcasters proceeded to answer the complaint, asserting among other responses the affirmative defense that they were licensed to broadcast Freeplay's compositions. Freeplay then moved for partial summary judgment striking that defense, and the Broadcasters cross-moved for summary judgment dismissing any claims based on their broadcasting allegedly infringing material created by others, arguing that its license defense was dispositive of such claims.[1]

II.     Factual Background

Discovery has not been completed, and the factual record is sparse. It is undisputed that Freeplay holds copyrights both in certain musical compositions and in sound recordings embodying those compositions. Freeplay asserts, and for purposes of this motion it will be assumed to be the case, that the Broadcasters have broadcast recordings that illegally incorporate its compositions. The exact nature and origin of the material broadcast has not been established,

---

[1] After filing its own motion for summary judgment, Freeplay filed an Amended Complaint. In opposing the Broadcasters' motion, Freeplay argues that defendants' motion is procedurally barred, because it was filed before defendants answered the Amended Complaint. This is mere gamesmanship. In the first place, since the Broadcasters had already answered Freeplay's original complaint, an Amended Complaint may only be filed "by leave of court or by written consent of the adverse party." Fed. R. Civ. P. 15(a). Freeplay has secured neither the defendants' consent nor the Court's leave to file. While such leave "shall be freely given when justice so requires," id., justice manifestly does *not* require allowing filing of an amended complaint in order to abort the briefing of an issue whose prompt resolution will expedite resolution of the case, particularly where the party seeking to amend itself invited resolution of that very issue by filing its own motion. Freeplay's position in this regard is totally incoherent: although it argues that the Broadcasters' motion addresses an outdated complaint, Freeplay's own motion, which it has not withdrawn, seeks to strike a portion of the Broadcasters' answer to that very complaint. Accordingly, leave to file Freeplay's purported Amended Complaint is denied, and the Broadcasters' motion to strike the Amended Complaint is granted, without prejudice to Freeplay's seeking leave to file an Amended Complaint at some future time.

but it appears to be assumed by the parties that some or all of the allegedly infringing material consists of recordings made and supplied to the Broadcasters by third parties, such as commercial advertisements. It follows that resolution of the legal issue posed by this motion will significantly affect the scope of this action and the extent of defendants' potential liability. The Broadcasters' exposure will apparently be significantly greater if Freeplay can assert a claim for damages based not only on any use defendants have themselves made of its compositions, but also on their broadcasting recordings made by others that incorporate those compositions.

The Broadcasters' license defense is based on licenses they have obtained from Broadcast Music, Inc. ("BMI"). BMI, which is not a party to this lawsuit, is a non-profit organization that enters agreements with songwriters, composers, and music publishers. Under these agreements, the artists grant BMI a (non-exclusive) right to license public performance of their copyrighted musical works. Freeplay has entered such an affiliation agreement with BMI. BMI in turn issues licenses to customers, including the Broadcasters, permitting them to publicly perform all of its affiliated artists' copyrighted musical works. BMI collects fees from its licensees, and in turn pays royalties to the artists according to the terms of its agreements. It is undisputed that Freeplay's musical compositions are covered by BMI licenses issued to the Broadcasters. The Broadcasters claim that these licenses defeat any claim against them for broadcasting programming created by others that incorporates Freeplay's compositions, even if such programming was created in violation of Freeplay's "synchronization rights." Freeplay argues that it does not.

## DISCUSSION

Copyright is commonly conceived as "a bundle of discrete exclusive rights" each of which may be transferred or retained separately by the copyright owner. N.Y. Times Co. v. Tasini, 533 U.S. 483, 495-96 (2001) (internal quotation marks omitted). See 17 U.S.C. § 201(d)(2) ("Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred . . . and owned separately."). Freeplay's claim concerns one specific right included within a copyright for a musical composition or sound recording, the so-called "synchronization right."

The Copyright Act does not explicitly define or confer any separately-labeled "synchronization" right. It does, however, give the copyright holder the exclusive right (among others) "to reproduce the copyrighted work in copies or phonorecords." 17 U.S.C. § 106(1). As the Second Circuit has described it, "the so-called synchronization right, or 'synch' right . . . [is] the right to reproduce the music onto the soundtrack of a film or a videotape in synchronization with the action. The 'synch' right is a form of the reproduction right also created by statute as one of the exclusive rights enjoyed by the copyright owner." Buffalo Broad. Co., Inc. v. Am. Soc'y of Composers, Authors & Publishers, 744 F.2d 917, 920 (2d Cir. 1984). The Court went on to note, "When [a] producer wishes to use outside music in a film or videotape program, it must obtain from the copyright proprietor the 'synch' right in order to record the music on the soundtrack of the film or tape." Id. at 921. Such a license is necessary because "incorporating a copyrighted sound recording into the soundtrack of a taped commercial television production infringes the copyright owner's exclusive right of reproduction." Agee v. Paramount Commc'ns, Inc., 59 F.3d 317, 319 (2d Cir. 1995).

The exclusive right to *reproduce* a copyrighted composition or recording, of which the synchronization right is an aspect or subdivision, is distinct from the right, separately granted to a copyright holder by 17 U.S.C. § 106(4), to *perform* a copyrighted musical work publicly. The distinction, at least in its most common applications, is straightforward: performing a copyrighted musical composition (say, singing Bob Dylan's song "Blowin' in the Wind") on a radio show constitutes a *performance* of the work; incorporating a tape of a copyrighted recording into a television commercial or the soundtrack of a movie (say, copying the recording of Mr. Dylan singing "Blowin' in the Wind" onto the soundtrack of a commercial for a store selling kites or a fiction film about hang-gliders) constitutes a *reproduction* of the work (specifically, in the form of synchronization).

Rights to perform and reproduce copyrighted works are separately granted and may be separately licensed. For example, both musical compositions such as songs, 17 U.S.C. § 102(a)(2), and particular sound recordings embodying versions of those compositions, id. § 102(a)(7), may be copyrighted, but different rights attach to each. Thus, any copyright confers on its owner the exclusive right to reproduce the copyrighted work. Id. § 106(1). However, while a copyright in a musical work confers the exclusive right to perform the copyrighted work publicly, id. § 106(4), a copyright in a sound recording does not. Id. §§ 106(4), 114(a). Although the owner of a copyright in the musical composition holds the exclusive right both to reproduce and to perform the composition, he or she may license, or decline to license, either right separately.

It is common ground between the parties that BMI licenses cover the public *performance* of Freeplay's compositions, and therefore authorize the Broadcasters to play recordings of

Freeplay's music on the air during their radio programs. The BMI licenses do not purport to authorize licensees to *reproduce* works of its affiliated copyright owners, however. Thus, holding a BMI blanket license would not authorize a licensee to engage in synchronization. More specifically, the BMI license would not authorize the Broadcasters to create promotional audiotape that used Freeplay's recordings as a background to a commercial urging listeners to "tune in to WXYZ radio."[2] The question that divides the parties is whether the licenses authorize the Broadcasters to play recordings that incorporate Freeplay's compositions, the making of which infringed Freeplay's reproduction rights.[3]

The Second Circuit's decision in Agee addressed a closely connected issue, in a way that the Broadcasters contend is dispositive of the issue. Agee owned the copyright in two sound recordings (but not in the underlying musical compositions). Without obtaining a license from Agee, Paramount, a producer of television programs, used the recordings on the soundtrack of a television program (apparently to humorous effect) to accompany visual images of a pair of

---

[2] The Broadcasters have disputed this proposition, arguing that "synchronization" is specifically defined in the leading cases as including a musical work on the soundtrack of an audiovisual work, "synchronized" to the action on the video recording. The Court rejected that argument, noting among other things that the reason such "synchronization" is the exclusive right of the copyright holder is that it constitutes the "reproduction" of the musical work. See Freeplay, 2005 WL 1500898, at *2 n.1. Such reproduction by another need not be synchronized with visual images to constitute an infringement. See Agee, 59 F.3d at 322 ("[C]ommercial entities . . . may not reproduce sound recordings on soundtracks of audiovisual works, whether or not the reproduction involves synchronization."). Unlicensed reproduction of the work infringes the copyright whether the medium of the reproduction is a film soundtrack, a videotape, or an audiotape.

[3] This opinion addresses only the scope of the BMI license. Whether the Broadcasters have acquired a license to synchronize Freeplay's copyrighted works in some other manner is not before the Court, and the Court expresses no opinion about any claim of license from any source other than the BMI license.

7

bumbling burglars. The program was then sold to television stations which broadcast it as part of their programming. Agee sued both Paramount and the TV stations.

The Court of Appeals held that Paramount's actions violated Agee's reproduction rights, which were held to be "broad enough to include a synch right, which would require a producer to obtain authorization from the owner of a sound recording before reproducing that recording in the soundtrack of an audiovisual work." Agee, 59 F.3d at 322. The result was different for the TV stations, however. The Court rejected the argument that the TV stations infringed Agee's copyright by broadcasting the infringing program. In essence, the Court held that the TV stations' broadcast of the offending program constituted a *performance* of Agee's recordings, not a reproduction or distribution of them.[4] "Because [the owner of a copyright in a sound recording] has no exclusive performance rights, see 17 U.S.C. § 114(a), the TV stations were entitled to broadcast [the recording] without [Agee's] consent." Id. at 326. Even broadcasting an infringing *copy* of the recording, whether made by Paramount or by the stations themselves, "would still constitute a 'performance,'" and thus be within the TV stations' rights. Id. So would the performance (broadcasting) of a derivative work illegally created by Paramount. Id. To accept Agee's theory would have granted the holders of copyrights in sound recordings a performance right that the statute specifically declined to confer.

---

[4] The TV stations did make a copy of the program, but the Court held that this limited reproduction fell within the statutory "ephemeral recording exemption," 17 U.S.C. § 112(a), applicable to "transmitting organizations" such as broadcasters, because they made only a single copy of the program, used it solely for their own transmission of the program, and were contractually obligated either to return the copy to Paramount or to destroy it. Agee, 59 F.3d at 326.

8

Freeplay argues that Agee is distinguishable because it, unlike Agee, owns copyrights not only in its sound recordings but also in the underlying musical compositions. That is true, as far as it goes. Had Agee owned the copyright in compositions, and had the TV stations, without license from Agee, broadcast the offending program, the Second Circuit's reasoning would not have applied, and the TV stations would presumably have been liable. Here, however, the Broadcasters *have* a performance license from Freeplay, via BMI. The logic of Agee is that regardless of any violation of reproduction rights that may have occurred in the creation of a piece of programming, a party who has the right to *perform* the copyrighted work can perform it without itself becoming liable for the underlying infringement. It makes no difference whether the broadcaster has the right to perform the work because no exclusive performance right existed in the first place (as with the sound recording in Agee), or because the performance right existed but had been licensed to the broadcaster (as with Freeplay's musical compositions here). Either way, the point is the same: the broadcaster has the right to perform the work, and the fact that the "program was 'tainted' by [the producer's] unauthorized use of [the] work" does not defeat that right. Id. at 326.

Nor is Freeplay assisted by its argument that although its works themselves are part of the "BMI Repertoire" licensed to the Broadcasters for performance, "if an advertiser illegally synchronizes a musical composition with other music, words and/or other sounds to create a radio commercial, then that radio commercial constitutes a 'derivative work' and is a new composition which is *not* in the BMI Repertoire." (P. Mem. 9; emphasis in original.) The Agee Court left open whether Paramount's television program constituted a derivative work, since Paramount's violation of Agee's reproduction right formed a sufficient basis for Paramount's

9

liability. 59 F.3d at 324. It held, however, that even assuming that it did, "[t]he TV stations also would have been entitled to perform a *derivative work* that Paramount had created using Agee's sound recording." Id. at 326 (emphasis in original). The Copyright Act only gives copyright holders (of sound recordings or musical compositions) the exclusive right "to *prepare* derivative works based upon the copyrighted work. " 17 U.S.C. § 106(2) (emphasis added). "[I]t says nothing about the right to *perform* such [derivative] works." Agee, 59 F.3d at 326 (emphasis in original).

Put another way, assuming arguendo that radio commercials using Freeplay's music would qualify as derivative works,[5] the statute makes the creation of the derivative work an infringement of Freeplay's copyright; it does not automatically confer on Freeplay a copyright in the commercial. Freeplay argues that the BMI licenses cannot cover such commercials, because such a commercial "is not a musical composition 'in which publisher [Freeplay] owns or controls performing rights' which BMI has licensed from [Freeplay]." (P. Mem. 11, quoting BMI license, Schreer Decl. Ex. A). But this argument is self-defeating: the reason the commercials are not covered by the license is precisely because Freeplay does not control any copyright in them. In any event, the Broadcasters do not claim that the BMI license authorizes them to perform the *commercials* – presumably they have a license to do that from the

---

[5] It is not clear that Freeplay has pled an infringement of its exclusive right to prepare derivative works. Moreover, as the Second Circuit pointed out in Agee, it is not clear that the creation of a commercial of the sort hypothesized here, which simply uses copyrighted music as background, without alteration, constitutes creation of a derivative work (as opposed to a simple violation of the copyright owner's reproduction right). A derivative work must effect some transformation of the original, as by rearranging, remixing or otherwise altering it in sequence or quality. Agee, 59 F.3d at 324, citing 17 U.S.C. 114(b). The record is insufficient to resolve such questions, and doing so is unnecessary to this Court's resolution of the motions before it.

advertisers, and if they don't, Freeplay has no standing to complain – rather, the Broadcasters argue that the licenses give them the right to perform *Freeplay's compositions*. By broadcasting a putative derivative work created by a third-party advertiser, the Broadcasters did not *prepare* a derivative work, any more than did the TV stations in Agee. They thus did not infringe Freeplay's right to control the creation of derivative works as granted by § 106(2). Thus, any infringement of Freeplay's copyrights by a third-party producer of radio commercials, whether conceived as a violation of Freeplay's reproduction (synchronization) right or of its right to prepare derivative works, cannot enlarge Freeplay's rights in its own compositions or revive an exclusive right that has been fully licensed to the Broadcasters.

Freeplay argues, finally, that BMI does not collect information from its licensees about performances of musical compositions incorporated in commercials of the sort hypothesized here, and therefore pays no royalties to Freeplay for such performances. (P. Mem. 13-14.) If that is so, it is a matter between BMI and Freeplay, and does not affect the resolution of the copyright issues before the Court. Whether BMI is obligated to collect such information and pay such royalties depends on an interpretation of BMI's agreement with Freeplay. If BMI is so obligated, and is in breach of its obligations, Freeplay's cause of action lies against BMI, not the Broadcasters. If BMI is not so obligated, then Freeplay can seek to renegotiate its agreement with BMI.[6]

---

[6] The only case cited by either side that appears to be directly on point is Jackson v. Stone & Simon Adver., Inc., 188 U.S.P.Q. 564 (E.D. Mich. 1974). In Jackson, a copyright holder claimed that the broadcast of its copyrighted composition as part of a television advertisement prepared by a third party violated its copyright. The court held that the television stations' broadcast of a commercial that made unlicensed use of a copyrighted work was authorized by the stations' BMI licenses to perform the work, and that "the contract between BMI and [the copyright holder] . . . constitutes a complete bar to any action against the television stations." Id.

## CONCLUSION

Accordingly, plaintiff's motion for partial summary judgment striking defendants' affirmative defense predicated on the BMI licenses is denied. Defendants' motion for partial summary judgment is granted, to the extent that any claim by plaintiff for copyright infringement based on the broadcast of material infringing plaintiff's synchronization rights produced by third-parties is dismissed. Since plaintiff's complaint alleges that at least some of the challenged material was prepared by defendants themselves, the complaint remains viable, and discovery may continue with respect to that claim. Defendants' motion to strike plaintiff's Amended Complaint is granted, without prejudice to any future motion by plaintiff to amend its complaint.[7]

SO ORDERED.

Dated: New York, New York
December 12, 2005

_____
GERARD E. LYNCH
United States District Judge

---

at 565. The Jackson court thus reaches precisely the same conclusion as this Court.

[7] Plaintiff's motion also seeks modification of the Court's case management order, which bifurcated discovery with respect to liability and damages. That motion is denied. In light of the Court's resolution of the summary judgment motion, the first order of business is to determine whether plaintiff can establish any violation of its rights at all, before undertaking an inquiry into damages.